UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
DASHAWN PERRY,                                              :
                                                            :
                                                            :  **MEMORANDUM DECISION AND**
                         Plaintiff,                         :  **ORDER**
                                                            :
         - against -                                        :  20-cv-2487 (BMC)
                                                            :
                                                            :
ANDREW M. SAUL, Commissioner of                             :
Social Security,                                            :
                                                            :
                                                            :
                         Defendant.                         :
----------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff seeks review of the decision of the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that he is not disabled for purposes of receiving disability insurance benefits under the Social Security Act. The ALJ found that plaintiff has impairments of high cholesterol, high blood pressure, obesity, a neck disorder that causes pain in his shoulders and arms, and two herniated discs in his middle back, but that none of these impairments, singly or in combination, were "severe" as defined by the regulation. Nevertheless, the ALJ proceeded with the remainder of the five-step analysis, finding that plaintiff had sufficient residual capacity to perform the full range of light work.

      Plaintiff has identified five points of error: (1) the ALJ failed to mention, let alone adopt or weigh, an opinion from one of plaintiff's physicians; (2) there is no substantial evidence that plaintiff has sufficient RFC to perform light work; (3) the ALJ's reasons for not crediting plaintiff's subjective complaints are not supported by substantial evidence; (4) there is no substantial evidence that plaintiff can perform his past relevant work as an exterminator; and (5)

the derivative result of the foregoing inadequacies was that the vocational expert's alternative conclusion that plaintiff could perform other light work jobs was based on an inadequate hypothetical. However, because I reject his first point, I need not reach the others, as they are all based on the ALJ's dictum and derivative of plaintiff's first point.

I.  **Failure to consider treatment notes of Dr. Mendoza**

The timeline in this case is important, and the most important date is plaintiff's date last insured of December 31, 2014 (the "DLI"). That created a relatively short relevant period because his alleged onset date was June 27, 2014. Plaintiff is seeking benefits for a closed period beginning with his alleged onset date and ending March 29, 2017, after which he concedes he was no longer disabled. But to do that, again, he had to show that he became disabled between June 27, 2014 and December 31, 2014.

Plaintiff had previously received disability benefits for a different closed period, from 2008 to 2011, for a work-related injury to his neck. After the end of the closed period in 2011, he did not see any health professionals until June 27, 2014, when he saw a Nurse Practitioner at Bedford Stuyvesant Family Health Center ("BFHC"). The purpose of this visit was for an annual physical, but he did complain that his prior neck injury was getting worse. He went back six weeks later for a follow up to get his blood test results (which showed high cholesterol and high blood pressure) and saw a doctor. However, there was no mention of his neck or back except a notation in his medical history; the discussion with the doctor was entirely about his blood pressure and cholesterol.

That was all he had by way of medical treatment before his disability coverage expired on December 31, 2014.

The lack of care during the relevant period might not be problematic for plaintiff had he promptly continued to seek treatment. The problem is that he didn't seek treatment or visit a health care professional until nearly a year and half later, on January 5, 2016, by which time his disability coverage had long since lapsed.

Thus, right off the bat, one can see an obstacle to plaintiff's claim – he was asking the ALJ to accept that he had disabling pain from June 27, 2014 but didn't see a medical professional about it for sixteen months. That's a long time to go with disabling neck pain and no medical treatment. This is especially so when one considers that, according to what plaintiff told his provider at the August 5th follow-up appointment, he traveled back and forth from Baltimore between his June 27th and August 5th appointments.

Plaintiff might even be able to overcome that hurdle if the report of his condition on June 27, 2014 was so bad that it supported a finding a disability. But it wasn't. The notes recite the history of his 2008 injury (for which, again, he had received disability benefits until 2011, when he apparently recovered enough to stop being considered disabled). The examination noted an unspecified limitation in his neck's range of motion, an unspecified reduction of strength in his left arm, and some pain in his spinal muscles. But it also noted that his neck was supple and not tender. He had normal sensation and reflexes. He had no problem with his gait. The only treatment the NP prescribed was that he should take an NSAID and a muscle relaxer. There was no recommendation for physical therapy (as he had during the prior closed period of 2008-2011) or other treatment. It appears that the NP recommended a new x-ray, but plaintiff did not follow up.

Even his appointment sixteen months later (January 5, 2016), well after his DLI (December 31, 2014), doesn't appear to have been related to his back. He went for a work

3

physical and to get a TB test – under the first section of the treatment note, entitled "Chief Complaints," the doctor noted: "1. Annual/Physical Exam. 2. Pt states he needs a ppd."[1] The examining doctor also noted that plaintiff had appeared "for annual check up and also wants TB test for job." Plaintiff did report as part of his medical history that he had lower back and neck pain. But he also reported that he was "feeling good." Perhaps more importantly, he told the examining doctor that he was not taking the NSAID or the muscle relaxer even though they had been prescribed. The doctor's thorough report of systems was normal, except for some muscle tenderness in plaintiff's back.

By the end of February 2016, plaintiff was reporting that his neck condition had continued to deteriorate and that he had radiating pain. This was the first time since 2014 that the purpose of a medical appointment was in fact because of neck and back pain. The examining physician noted that his neck was supple, but he had back pain with rotation and tenderness in his trapezius muscle (the large, superficial muscle in the back). He still had not been taking any pain medication but the doctor again prescribed an NSAID and muscle relaxant. He was referred to radiology for an MRI. BFHC called him on March 22, June 30, August 22, and September 15, 2016 to check whether the MRI had been performed but he did not answer the calls, and the final message notes that the referral had expired.

In June 2016 plaintiff visited another NP complaining of neck pain. Even then, the NP again found "neck supple, full range of motion." The NP diagnosed a soft tissue neck strain. By the end of August, however, with plaintiff still complaining of neck pain, the diagnosis had progressed to cervical disc degeneration, displacement, and herniation. The NP referred plaintiff to a pain management specialist, Dr. Justin Mendoza.

---

[1] A PPD is a "purified protein derivative" skin test, the formal name for a tuberculosis test.

It is against this backdrop that I must consider plaintiff's argument that the ALJ failed to consider Dr. Mendoza's evaluations.[2] The first was dated September 29, 2016 – more than two years after plaintiff alleges he became disabled and almost two years after his DLI – and the second was November 17, 2016, about five weeks later. The initial evaluation was based on Dr. Mendoza's first meeting with and examination of plaintiff on that same date. Plaintiff complained of pain of 8/10, constant right arm numbness, and dropping things due to pain. Dr. Mendoza found soft tissue irregularities throughout plaintiff's back, a limited range of motion in his lumbar back and pelvis, muscle spasms, tenderness, and some sensory loss. He advised that plaintiff should "avoid repetitive forceful, strenuous, twisting, [and] jerky activities" as well as "pulling, pushing, bending, lifting, or carrying anything heavy." Dr. Mendoza saw plaintiff again about five weeks later, on November 17, 2016, and Dr. Mendoza's evaluation was, if anything, even more severe, including a referral for a neurosurgery evaluation.

Plaintiff's point rests on the fact that the ALJ did not even mention Dr. Mendoza's treatment notes, and argues that since an ALJ, in determining RFC, "must always consider and address medical source opinions," this alone requires remand. The Commissioner, in response, argues that because Dr. Mendoza's treatment notes were based on examinations of plaintiff nearly two years after his DLI, and there is nothing in those notes as to whether the conditions that Dr. Mendoza saw in late 2016 also were present on December 31, 2014, the treatment notes are irrelevant to the ALJ's analysis. I agree with the Commissioner.

---

[2] Plaintiff refers to Dr. Mendoza's evaluation notes as "medical source statements," and I suppose they technically are under the regulations. See 20 C.F.R. § 404.1513. However, it is important to note that he did not write them for the purpose of offering medical opinions. The records of his appointments with plaintiff are more properly viewed as treatment notes. Their purpose was to record the results of plaintiff's examination on each day and to propose a treatment plan going forward.

5

It is clear that medical source statements can be relevant even if they are rendered after the DLI. However, a review of Second Circuit case law on this point recognizes two situations where this principle applies. First, if the medical source statement expressly states that plaintiff's condition existed on the DLI, the ALJ must consider it. See Wagner v. Sec'y of Dep't of Health & Hum. Servs., 906 F.2d 856, 861 (2d Cir. 1990) (error to dismiss physician's retrospective diagnosis). The other, less common way in which a post-DLI medical record may be relevant to the insured period is if the other evidence in the record ties the post-DLI condition tightly to the pre-DLI condition. See Lisa v. Sec'y of Dep't of Health & Hum. Servs., 940 F.2d 40, 44 (2d Cir. 1991) (post-DLI evidence that discloses the severity and continuity of earlier impairments should be considered). This can be either by a short duration between the pre- and post-DLI evaluations, or a strong similarity between the two evaluations (or both), so that the ALJ could reasonably draw a conclusion of continuity. See id. Neither of those situations is present here.

There was nothing retrospective about Dr. Mendoza's evaluation. It was a snapshot in time as of September 29, 2016. It offered no opinion about how long the conditions that Dr. Mendoza observed on that date had existed. Of course, it is obvious that the conditions that Dr. Mendoza observed did not spring like Athena from the forehead of Zeus. But the other evidence in the record strongly suggests that those conditions did not exist during the insured period. The evidence summarized above demonstrates at most that plaintiff had mild neck pain during the insured period ending in 2014, and that the condition did not progress to the level observed by Dr. Mendoza until, at the earliest, late February of 2016.

The ALJ therefore had no obligation to consider evidence so far beyond, and untethered to, the DLI. Even if he did, that error was harmless because it could not have changed the ALJ's

decision on disability. Nothing in Dr. Mendoza's treatment notes, alone or together with the other evidence, sheds any light on whether plaintiff was disabled prior to his DLI.

## II. Remaining points

All of plaintiff's remaining points of error pertain to the ALJ's findings at steps 4 and 5 of the five-step sequential analysis, including the need to determine plaintiff's RFC before reaching step 4. There is an irony in plaintiff's arguments. The ALJ found that plaintiff's impairments did not rise to the level of "severe" at step 2 of the five-step sequential analysis. She could have stopped there. Instead, "giving the claimant the benefit of the doubt," she "proceed[ed] to the remaining steps of the sequential analysis process." And having done that, plaintiff's counsel perceived an opportunity to challenge her determinations at those remaining steps of the analysis. Nevertheless, because all of the post-step 2 findings are unnecessary to her decision, those findings are entirely dictum.

Significantly, other than arguing that, by failing to consider Dr. Mendoza's evaluations, the ALJ did not properly evaluate plaintiff's subjective testimony – a point that I have rejected above – plaintiff has not challenged the findings at step 2 that plaintiff had no severe impairments prior to his DLI. Nor could he. As shown above, there was virtually no evidence of impairment during the insured period (indeed, there are barely any medical records at all), and the ALJ's findings at step 2 were both thorough and airtight. After reviewing all of the evidence (including post-DLI evidence other than Dr. Mendoza), the ALJ found:

> The conclusion that the claimant does not have an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities is consistent with the objective medical evidence and other evidence. There is quite simply very little objective medical evidence supporting his allegations. The claimant alleges disability due to musculoskeletal pain; however, the record contains no imaging and the claimant has received only conservative treatment for his impairments. Additionally, there is no evidence that

7

> claimant's impairments of hyperlipidemia, hypertension, and obesity cause
> significant limitations. The claimant's reported symptoms are extreme, but are not
> supported by the objective medical evidence. Furthermore, the medical evidence
> of record covers a limited timeframe and contains few objective testing and
> clinical results. The evidence does not clearly establish any functional limitations
> from any medically determinable impairments that have lasted for a period of 12
> months or longer.

There is no colorable way to dispute this conclusion, and, other than relying on Dr. Mendoza's evaluations nearly two years after his insurance expired, plaintiff does not. Plaintiff clearly had no severe impairments prior to his DLI.

Plaintiff contends that I should nevertheless review the ALJ's RFC and steps 4 and 5 analysis because "to the extent that the ALJ did find Mr. Perry limited to light work exertional activity, there was clearly a severe impairment (by definition) as otherwise he would have no limitations." This ignores the distinction between findings and dictum. The ALJ was very clear in finding that plaintiff failed to meet his burden at step 2 of showing that his impairments were severe, but nevertheless proceeded with the analysis. That procedure doesn't make her subsequent analysis any less dictum, and since plaintiff has not further challenged the step 2 determination, there is no reason for me to reach his additional arguments.

## CONCLUSION

Plaintiff's motion for judgment on the pleadings is denied, and the Commissioner's cross-motion for judgment on the pleadings is granted. The Clerk is directed to enter judgment dismissing this case.

**SO ORDERED.**                    Digitally signed by Brian M. Cogan
                                   _____
                                                U.S.D.J.

Dated: Brooklyn, New York
       May 14, 2021